Good morning, your honors, and may it please the court. I'm Deputy Attorney General Pamela B. Hooley from the Office of the Attorney General, representing the respondent below and the appellant here. This appeal was brought for two reasons. The district court decision in this case was looking at your water longingly earlier, and I think I need some more. Okay, we'll bring you some water. All right. Come on. Who's got the water? Just ask for it. We'll give you direct service. Put another cup up there. You know, you should drink. My trainer says you need to drink at least two liters a day. I definitely follow that at work, your honor. It keeps me from sitting at my desk too long. Let me start again, then, and make sure that you can all hear me. This appeal was brought for two bases. The first one is that the district court, in overturning the state decision in this case, did not comply with the anti-terrorism and effective death penalties deference standard. Because the state court decision below was not an unreasonable application of clearly established Supreme Court authority, nor did the state courts make an unreasonable determination of the facts. The second reason for the appeal is that the district court abused its discretion after overturning the state's decision by ordering this inmate's release. In this case, the initial question is whether there is a liberty interest, and that issue is before this court presently on rehearing in SAS. But even conceding that there is a liberty interest, parole is fundamentally a state issue. The liberty interest arises from state law. The state is entitled to deference in the interpretation of its own statutes, and under California law, the commitment offense can be relied upon. In the district court, and on appeal, Mr. Sanchez relies repeatedly on dicta from Biggs. Again, as recognized in SAS, that's merely dicta concerning whether the crime can be relied upon. No Supreme Court law prevents that, and SAS recognizes that that was not binding on the state courts. Secondarily, even if there were a due process violation, the appropriate remedy would have been a remand to allow the court to provide due process. Well, actually, it would be a remand to the governor, would it not? Exactly, Your Honor. Not the court. Not to the district court. I apologize for that confusion. Yes, what the district court did was inappropriate. It should not have ordered the release of someone who's been found unsuitable for parole. And there is indeed some evidence in the record, and again, assuming that the sum evidence standard applies for evaluating parole suitability determinations. California courts have applied the sum evidence standard for reviewing, but there is no clearly established federal law that requires the sum evidence standard in the context of parole decisions. In fact, Greenholtz suggests that there may be a very different standard for predictive suitability decisions as compared to disciplinary decisions which look backwards. But even allowing that the sum evidence standard applies, there is some evidence in this case that the crime demonstrates Mr. Sanchez's lack of suitability, and that during the hearing, he continued to demonstrate some lack of remorse and lack of responsibility by continuing to deny that he was responsible for this gangland shooting. That's in the opinion of the board, or in the opinion of the governor. In the opinion of the governor, yes. Now there's a new governor, what can he do? Does he have any, can he go back and start all over again, or does he have another application in the works, or do you know? It's my, I'm not exactly sure where Mr. Sanchez is in the process now. His counsel may know better where he stands with having a subsequent review, because these proceedings are expedited. But it would be my understanding that under California law, he would be entitled to another review in a year, assuming the governor's decision is allowed to stand and the district court's decision here is reversed. Everything's on standstill until we do our thing? No, he would be put on calendar. Actually, no, that's correct, because we've sought a stay of the order requiring his release, so he would not be put on calendar presently because the order that's being appealed overturned the governor's decision and injected the district court into, because of a difference of opinion, making a suitability decision, which draws into Your Honor's notation with respect to immigration cases. If district courts are going to inject themselves into state parole suitability decisions and not apply EDPA properly, your caseload will be substantially burdened with parole cases. No, the stay that is in effect stays the district court order. Of release. Right, it doesn't stop the state of California from giving him another hearing and having a new governor sign off on it. No, but at this point he wouldn't be scheduled for one because presently the governor's decision is on hold. That's my understanding. I'd have to confirm that with the board. But given that this case exists, I don't know that they would put him on for hearing. I'd have to check that. I apologize for not knowing. Presumably he could have another hearing because as time goes by, when decisions are made where there are reversals by the governor, there are subsequent board hearings, and the board is then permitted to consider any new and additional information that's come forward. Well, my only point was he's already won before the board. So if he goes to the board again, chances are he'll win before the board again. His problem was with the governor, but the governor's not the governor anymore. We have a new governor, so. That's not necessarily the case, Your Honor, just because the parole suitability determination is not necessarily static. The parole statute in California allows that the timing and gravity and circumstances of the crime are relevant. So if a new board looks at him, presumably he has put the crime further behind himself, so that would go in his favor. But if, for example, disciplinary problems occur in prison, those could go against him. So it's not necessarily the case. But assuming that that situation has remained static and that the board would stand by its final decision, if we remanded it to Governor Schwarzenegger, we essentially would be overturning the determination that Governor Davis made and asking Governor Schwarzenegger, what, to take another look at this file or to reverse Governor Davis's decision and allow him to be paroled? Well, obviously the appellant's position would be that Governor Davis's decision does have some evidence in the record supporting it, so there would be no need for a remand. But if this court... But I thought I heard you arguing that the sum evidence standard is a creature of Federal appellate cases and that there is no Supreme Court case on point that so holds. That's also true. The California courts in this Court have imported the sum evidence standard from the disciplinary context and applied it. From Hill, right. From Hill, exactly. Which is a prison discipline case that says that you can't discipline somebody without some evidence, some basis in fact. That's exactly correct. I find that he committed the disciplinary violation. And I guess in SAS our panel relied upon the Hill standard when it declared that there's a liberty interest in parole. But you're saying that's not good enough as a matter of AEDPA, that until the Supreme Court extends Hill to the parole context, there is no standard that the Supreme Court has articulated. So the California courts are free to apply whatever California law says about parole. That's exactly correct, Your Honor. And in fact, they have applied the sum evidence standard. But for this Court's purposes, under Greenholz, the only law that does set forth what the standards are for liberty interest, so long as there was a hearing and an opportunity to be heard in a decision, the inmate got the due process he needed, and therefore the petition should be denied. And if I may, I'd like to reserve my remaining time. Thank you. Good morning. Verna, we fought on behalf of Appellee Fernando Sanchez. I could inform the Court a little bit about the status of Mr. Sanchez's case. The district court has not yet ruled on the request for release that was filed pursuant to the Ninth Circuit's The Ninth Circuit granted the stay without prejudice to go back down to the district court to request release pursuant to a variety of conditions, and the request was made to release him to immigration custody. But the concern there is if he goes to immigration, then they'll deport him, right? He's gone. No. My understanding is that he can be released to immigration custody, and he would stay there pending this Court's ultimate decision. The reason that that request was made What jurisdiction would we have at this point over the Department of Homeland Security? We don't have a petition for review pending on his behalf from a BIA determination, do we? I mean, why wouldn't DHS be free if he wants to waive his rights under the immigration laws? Why wouldn't they be free to simply deport him as a convicted, aggravated felon to Guatemala? Well, it seems to me that the district court, and certainly this Court, could issue a release under the habeas statute, or the habeas rules, that he be released to the immigration custody, but not deported pending the ultimate decision of this Court. I mean, is he just looking for a better place to house himself? Is that why he wants to go? No, I know. It seems kind of bizarre, except that in this particular situation, Mr. Sanchez was attacked by another inmate. He's been placed in administrative segregation for his own protection, and, you know, administrative segregation is a much more restrictive movement type thing. So you think he'll be safer? Immigration custody would be preferable. He'll be safer, and he'll be allowed in the general population at the immigration facility, which is not the case where he is now. That's correct. I will also say that I did speak to Mr. Sanchez and his counselor. After he was placed in administrative segregation, and before we got even to the stay order being issued by the Ninth Circuit, he had applied for a transfer to another prison where he could go reenter the general population, and my understanding is that, according to the counselor, the Bureau of Prisons, excuse me, not Bureau of Prisons, the Department of Corrections, is not going to act on that until there is a decision from this court, because of all the problems with overcrowding and that kind of thing like that, if he were to be successful in this court, then they can send him off to immigration, and that frees up, you know, the administrative, the bed space. It saves them a bed. Right, exactly. And the other thing is, in terms of the, he did have another parole hearing after this. I mean, I don't have those documents. Perhaps the Attorney General can forward them to me. I understand. I don't know all the exact details. Parole was denied, but not for any new evidence, not for any disciplinary problems. But I don't know what the circumstances are. I understand that the Department of Corrections or the Board of Prison Terms, however they're called now, they continue to hold scheduled parole hearings while the earlier decisions are being litigated in the courts. That's my understanding. But I can't tell you exactly what happened. Wouldn't that make this moot? I'm sorry? Wouldn't that make this case moot, then? He's already had another parole hearing? No, because if this was granted parole by the board, and the governor overturned that decision, and that is that decision that is being, and if he was entitled to be paroled and there is no new evidence that changes the situation. In other words, if he hasn't gotten into any trouble, he hasn't, you know, there's no reason to rescind it, obviously, you know, it doesn't make it moot, no. I think it makes it moot if he were granted parole. I think that would moot it out. Well, we don't know, I guess. Because the board may very well have denied parole based on Governor Davis' order. That's correct. I don't have that. That may be the only reason. But Davis has been gone for a while. When did he go before parole? Seems like a long time. When did he go before the parole board last? Your Honor, I don't have the exact figures for that because I don't have all the documentation from the Department of Corrections. All I know is that, you know, I was appointed to handle this case recently, and I'm scrambling to keep up with all the paperwork. But in any event, I don't think it would moot it out at all. I also wanted to respond to you. I mean, we hear from the Attorney General that he's not going to have another hearing until this is resolved, and you tell us he had another hearing. My knowledge on this is strictly hearsay, Your Honor. And exactly what happened and on why that happened, I don't know. But I mean, I could certainly take it upon myself to try to find out and get all the requests, all the paperwork, and I'm sure the Attorney General's Office would cooperate in that regard. In terms of the decision that the district court made in granting parole in this case, I believe the district court's decision should clearly be upheld. Even a de novo standard of review, the district court evaluated the facts and the law under the AEDPA standard of review very carefully and gave due deference to the state court's decision. And the governor's decision does not comply with the due ‑‑ because it mistakenly stated that Mr. Sanchez did not show remorse and continued to minimize his responsibility for this crime, but it was relying on a nearly 20‑year‑old probation report and earlier statements. In the hearing at which he was found suitable for parole, he repeatedly stated, I've always said it's my fault, you know, I was young and stupid, I take full responsibility for what happened, I'm very sorry, I feel really horrible about what happened. And the board itself found that he showed genuine remorse and that he was accepting responsibility for it. And so that is simply an inaccurate statement. Even under California law, the governor's decision was wrong under N. Ray Rosencrantz. The other statement regarding the ‑‑ So under AEDPA, would we have to declare the governor's decision to be an erroneous factual conclusion? Which shows that it's not supported by some evidence, because the evidence is inaccurate. In California, that's correct. And the other some evidence, in terms of the some evidence standard, the governor also found that he had not ‑‑ the state had not verified his parole plans in California, but of course he cannot be paroled to California. He's only going to be paroled to ‑‑ What do we do with the determination that this crime was more egregious than the typical second‑degree murder? The governor did not exactly say ‑‑ he did make a minimum statement that this is more than the minimum amount to qualify for a conviction under second‑degree murder. However, obviously that is somewhat of a subjective standard. It's difficult to ‑‑ the statute, you know, 187, does not state, you know, these are the facts that would be the bare minimum. We've got a transferred intent crime, right, because the victim was a completely innocent bystander. But we also have a solicitation to commit the assault that led to the murder by Mr. Sanchez and the facts that the governor relied upon surrounding the crime itself to conclude that this was a particularly aggravated second‑degree murder. I mean, it could have been a first‑degree murder case. But I think that if you look at, you know, this entire offense took place within about 30 minutes between the initial confrontation with the man who came over and sort of beating on his car with the baseball bat, and then, you know, Mr. Sanchez becoming enraged and angered and running off to find his friends and saying he wanted revenge, and it was ‑‑ it escalated very quickly. It was a very tragic thing to happen, and it is certainly not to minimize the tragedy of what happened here. But if we look at a lot of the other parole cases that have come not only before this court but before the California Supreme Court, in comparison to those other cases, take Rosencrantz, for instance, who is also convicted of second‑degree murder, you know, and the state courts are conducting these kinds of comparative analysis at this point. Rosencrantz himself, under a period of great stress, went out and bought an Uzi, weighed and weighed for the victim, and then shot him 10 times. So in comparison, clearly the ultimate result is a very tragic situation. No one is minimizing that, but ‑‑ What about the shooter in this case? Pardon me? What happened to the shooter in this case? He escaped and was never apprehended. Mr. Sanchez, as far as I'm aware, is the only one who ‑‑ there may have been one other person, but Mr. Sanchez is the one who was caught and who was punished, and he's been in prison for about 19 years now. But also getting the ‑‑ When Sanchez was indicted, or when ‑‑ okay, what was the original charge? Was it first‑degree murder or second‑degree murder? Well, I believe the information, which the attorney general may have in front of it, was 187. I'm sure they did not eliminate it. I don't know exactly the verdict, but the verdict was second‑degree. I don't know whether the prosecutor asked for first‑degree or not. I really couldn't say. I haven't familiarized myself with that. Okay, well, listen, your time's up. Oh, okay. Thank you. Thank you. Thank you. Thank you. If I can go briefly through several points, the last question being the first. The information is in the excerpts on page 48. The respondents' excerpts, they're both listed as ER since we filed simultaneous briefs. It was a violation of 187A. Secondarily ‑‑ So what's that now, 187A? I believe that's just ‑‑ it doesn't state whether it's murder one or murder two, but I believe it's murder one since the charge range was 25 to life, according to the information. And second‑degree murder is 15 to life. So that would indicate that it was a murder one, and as you've pointed out, there was a solicitation charge as well, which does escalate the crime beyond the minimum elements necessary to sustain the conviction in this case. Jury convicted of second‑degree murder. That's correct. Probably heat of passion or something like that. Well, actually, the appellate court in rejecting his appeal noted specifically that the assault with a deadly weapon and resulting murder were not an immediate reaction to a sudden provocation or heat of passion incident. So that's not correct in this case. That was rejected both at trial and on appeal, which resulted in the second‑degree. So at best we've got a jury nullification case, huh, where the jury decided to return a second‑degree murder for reasons we just don't know. I believe this was in response to his claim that he should have gotten an instruction on a voluntary manslaughter charge. Instead he was trying to reduce it further, and the appellate court rejected that. As for minimized responsibility, there is some evidence in the record, and that's all that's necessary. The governor's decision is not clearly erroneous. Under California law, he's entitled to weigh the evidence differently, and in this case he gave great credence to the fact that during the hearing, Mr. Sanchez continued to say it wasn't his idea to go back and seek revenge where this innocent man was killed. My time's up, but I have two more points to address if the court wants to hear them. I think I've got a good handle on it. We got it. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Pregerson, Silverman, Tallman